UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FAIR HOUSING JUSTICE CENTER, INC.,

               Plaintiff,

    -against-

DEVELOPING NY STATE LLC; GALAXY
DEVELOPERS LLC; ASTORIA 2 LLC; 39th
AVE HOLDINGS 1 LLC; 39th AVE HOLDINGS
2 LLC; 69 ADAMS LLC; NY BUILDING
ASSOCIATES, INC.; NARESH MAHANGU;
HAMISH WHITEFIELD ARCHITECTS, P.C.;
DURUKAN DESIGN, INC.,

              Defendants.

No.

**COMPLAINT**

Plaintiff Fair Housing Justice Center, Inc. ("FHJC"), by and through its attorneys Emery

Celli Brinckerhoff Abady Ward & Maazel LLP, alleges as follows:

**INTRODUCTION**

1.     Defendants include the developers and owners of newly constructed multi-family

rental housing in Queens and Brooklyn, New York, affiliated with the Rabsky Group, a major

developer of multi-family housing in New York City. These companies have openly ignored

their legal obligations and denied equal housing opportunity to people with physical disabilities

in New York City by designing and constructing rental buildings that do not comply with the

accessibility requirements of federal, state and local civil rights laws.

2.     Recently, Developing NY State LLC, Galaxy Developers LLC, Astoria 2 LLC,

39th Ave Holdings 1 LLC, 39th Ave Holdings 2 LLC, and 69 Adams LLC (the "Developer

Defendants"), developed and/or own the following three multi-family rental sites in Queens and

1

Brooklyn—Astor on Third II, the Northern, and Bridgeview DUMBO. None of these buildings comply with longstanding design and construction accessibility requirements.

3.      Astor on Third II, described by its developer as "thoughtfully crafted,"[1] is a 137-unit rental building located in Astoria, Queens, New York.



4.      The Northern is a 198-unit two-building rental complex located in Long Island City, Queens, New York. Its developer claims that "each residence exudes contemporary refinement and meticulous design."[2]



---

[1] *See Residences*, Astor on Third II, https://www.astoronthird.com/residences.

[2] *See The Estate*, The Northern LIC, https://www.thenorthernlic.com/.

5. Bridgeview DUMBO ("Bridgeview") is a 225-unit rental building located in DUMBO, Brooklyn, New York. Bridgeview's developer claims that the building "offers apartments that suit every lifestyle."[3]



6. Each of the Subject Properties is marketed to the public as having been thoughtfully designed to meet the needs of any potential resident, when in fact, they are not accessible to renters or their guests with physical disabilities as required by law.

7. Testing conducted by the Plaintiff FHJC has revealed these sites have significant design and construction flaws.

8. Federal, state, and city fair housing laws have long mandated that newly constructed multi-family housing must be accessible to people with physical disabilities. Defendants and/or and their principals are aware of these requirements: several of the Defendants affiliated with the Rabsky Group through common principals; the architect of record (Defendant Naresh Mahangu) and his architecture firm (Defendant NY Building Associates); and the interior designer (Defendant Durukan Design) have been sued by FHJC before—some

---

[3] *See Layouts*, Bridgeview – Dumbo, https://bridgeview.nyc/.

multiple times—for designing and constructing inaccessible New York City apartment buildings and, in resolving those previous suits, agreed to comply with applicable fair housing laws.

9.    Nevertheless, Defendants willfully disregarded their legal obligations to design and construct apartment buildings with accessibility features that ensure safe and habitable dwelling units for physically disabled individuals.

10.    FHJC now brings this suit to hold Defendants accountable for their flagrant disregard of the law and to ensure that they stop building inaccessible housing in New York City.

**PARTIES**

*Plaintiff Fair Housing Justice Center*

11.    Plaintiff FHJC is a non-profit organization dedicated to ensuring that all people have equal access to housing opportunities in the New York City metropolitan region by eliminating housing discrimination and creating open, accessible, and inclusive communities. FHJC's office is located in the Eastern District of New York in Queens, New York.

12.    Among other things, FHJC: (a) provides information to the public and other non-profit organizations in the New York City area about fair housing laws and the services it provides; (b) provides intake counseling to individuals and organizations who have made allegations of housing discrimination; (c) conducts testing and other investigations of allegations of housing discrimination; (d) makes legal referrals to cooperating attorneys; and (e) provides post-referral litigation support services. FHJC provides these services free of charge and without regard to income. Additionally, FHJC operates a fund to assist low- and moderate-income people with disabilities in retrofitting their homes with necessary accessibility modifications.

13.    FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to non-profit organizations engaging in fair housing

4

enforcement activities, and engages in policy initiatives that further FHJC's mission, including the publication and dissemination of reports and educational materials.

14.     Since 2016, FHJC has operated the Adele Friedman Housing Accessibility Fund (the "Fund") for the purpose of providing financial assistance to persons with physical disabilities within FHJC's service area who need reasonable modifications made to their existing housing to make it accessible. FHJC staff works with the individual requesting the modification from initial intake to completion of the modification, including drafting and negotiating modification requests with landlords, management companies, and co-op and condominium boards. Through the Fund, FHJC recruits and compensates architects to evaluate a person's dwelling, propose necessary modifications, and provide a written proposal for the proposed modifications for a landlord or condo/co-op board. The Fund pays for those modifications where a landlord or condo/co-op board is not required by law to pay for them and the resident is moderate- or low-income. FHJC staff works with architects, contractors, and the housing provider to ensure modifications are made in a safe and effective manner.

15.     In its twenty years of operation in New York City, FHJC continues to find that the accessibility requirements of federal, state, and local fair housing laws regarding reasonable accommodations and modifications and new construction are not fully complied with by developers, building owners, architects, and design professionals like the Defendants. This lack of compliance has created thousands of inaccessible multi-family dwelling units in the New York City housing market, including those designed and constructed by Defendants.

16.     Even though the requirement to build multi-family dwellings with certain accessible features has existed since 1991, the inaccessible housing stock created in New York City continues to serve as a barrier to potential and current residents and their guests with

disabilities. For example, individuals living in multi-family buildings built without accessible features before 1991 are less likely to be able to move to newly constructed dwellings because those units too are inaccessible. As a result, people with disabilities have a greater need for modifications to the buildings in which they currently live, instead of being able to move to newly constructed accessible housing. In short, the supply of accessible dwellings has not increased as intended by federal, state, and local disability rights laws.

17.     These ongoing and continuing failures to comply with laws intended to create open, inclusive, and accessible communities consistent with FHJC's mission injure and impair FHJC's core activities and its ability to accomplish its mission and thus injure FHJC itself.

18.     For example, when developers, architects, and others such as Defendants design and construct inaccessible housing that cannot be retrofitted post-construction to comply with the law, the supply of accessible and adaptable housing is reduced within FHJC's service area.

19.     To address this ongoing accessibility crisis, FHJC has employed staff since its inception in 2005 to assist residents within its service area to make reasonable accommodation and modification requests to their landlords, condo and cooperative boards, and/or in other multi-family housing to make their housing more accessible on a case-by-case basis, even though fair housing laws require new housing construction to meet certain minimum accessibility criteria—precisely to avoid the need to modify buildings and units one at a time. FHJC staff review each individual's eligibility for reasonable accommodations and/or modifications through an intake counseling process; help individuals obtain medical support, if needed, for their requests; assist in drafting and making requests; and oversee the implementation of any approved requests, including inspecting retrofits after work is completed to ensure the resident's needs are met, and,

6

where required, coordinate the removal of modifications after a resident moves out of a rental unit.

20.     Since many residents within FHJC's service area are not aware of their right to seek modifications in multi-family buildings or of FHJC's services, FHJC staff conducts outreach to and builds ongoing partnerships with nonprofit organizations with clients with disabilities to inform them of their rights and of the ways FHJC can assist them, including by helping them secure necessary modifications to their inaccessible dwellings.

21.     FHJC also provides periodic training for architects and developers on accessibility requirements for new construction, even though these standards were first adopted by Congress in 1989, more than 35 years ago.

22.     FHJC staff creates and disseminates consumer fact sheets and other information on its website and through social media. FHJC staff also make in-person and virtual presentations to educate the public and social service organizations that serve people with disabilities about accessibility requirements for new construction.

23.     If those designing and constructing multi-family housing in New York, including Defendants, complied with the accessibility requirements of federal, state, and local fair housing laws, the need for these services would be reduced and FHJC's ability to accomplish its mission of creating accessible communities would not be thwarted. In other words, FHJC would not suffer the same injury if Defendants followed the law.

24.     FHJC employs individuals as "testers," who are persons posing as renters or homebuyers without an intent to rent or buy for the purpose of obtaining information about the conduct of landlords, real estate agents, rental management companies, housing developers, agents, and others to determine whether illegal housing discrimination is taking place. For

example, FHJC sends testers to newly constructed multi-family residential buildings to inquire about the availability of housing for rent for themselves or family members.

25.     FHJC has expended staff time and other resources to investigate and document Defendants' illegal conduct, including conducting a testing investigation. In each test, FHJC testers encountered violations of federal, state, and city fair housing laws as described below. FHJC expects to incur future economic costs in the form of staff time and other resources to ensure that Defendants do not continue to violate fair housing laws and to repair harm caused by Defendants to the community that FHJC serves.

***Defendants***

26.     Defendant Developing NY State LLC ("DNYS") is a limited liability company incorporated in Kings County, New York. Defendant DNYS's principal office is located at 505 Flushing Avenue, Brooklyn, New York 11205. Defendant DNYS was the developer of Astor on Third II and The Northern. As the developer, Defendant DNYS was responsible for the overall design and construction of the dwelling units and common areas at Astor on Third II and The Northern. On information and belief, Yitzchok Katz is the managing member of DNYS. On information and belief, Defendant DNYS is affiliated with the Rabsky Group.

27.     Defendant Galaxy Developers LLC ("Galaxy") is a limited liability corporation incorporated in Kings County, New York and registered with the New York Department of State at the same address as Defendant Developing NY State, 505 Flushing Avenue, Brooklyn, New York 11205. Defendant Galaxy was the developer of Bridgeview DUMBO. As the developer, Defendant Galaxy was responsible for the overall design and construction of the dwelling units and common areas at Bridgeview DUMBO. On information and belief, Defendant Galaxy is affiliated with the Rabsky Group.

28.     Defendant Astoria 2 LLC ("Astoria 2") is a limited liability company incorporated in Delaware and registered with the New York Department of State at the address 505 Flushing Avenue, Brooklyn, New York 11205. Defendant Astoria 2 is the owner of Astor on Third II. As the owner, Defendant Astoria 2 was responsible for the overall design and construction of the dwelling units and common areas at Astor on Third II. Defendant Astoria 2's managing member is Yitzchok Katz. On information and belief, Defendant Astoria 2 is affiliated with the Rabsky Group.

29.     Defendant 39th Ave Holdings 1 ("39th Ave 1") is a limited liability company incorporated in Delaware and registered with the New York Department of State at the address P.O. Box 241, Albany, New York 12201. Defendant 39th Ave 1 has been the owner of The Northern II from July 2, 2024 through the present. Prior to July 2, 2024, The Northern II was owned by an entity with the same name and ownership structure and operated out of the same business location as 39th Ave 1. Plaintiff includes Defendant 39th Ave 1 as a nominal necessary party pursuant to Federal Rule of Civil Procedure 19 as the Court cannot accord complete relief without it. Defendant 39th Ave 1's managing member is Yitzchok Katz. On information and belief, Defendant 39th Ave 1 is affiliated with the Rabsky Group.

30.     Defendant 39th Ave Holdings 2 ("39th Ave 2") is a limited liability company incorporated in Delaware registered with the New York Department of State at the address P.O. Box 241, Albany, NY 12201. Defendant 39th Ave 2 has been the owner of The Northern II from July 2, 2024 through the present. Prior to July 2, 2024, The Northern I was owned by an entity with the same name and ownership structure and operated out of the same business location as 39th Ave 2. Plaintiff includes Defendant 39th Ave 2 as a nominal necessary party pursuant to Federal Rule of Civil Procedure 19 as the Court cannot accord complete relief without it.

9

Plaintiff does not seek to hold Defendant 39th Ave 2 liable. Defendant 39th Ave 2's managing member is Yitzchok Katz. On information and belief, Defendant 39th Ave 2 is affiliated with the Rabsky Group.

31.    Defendant 69 Adams LLC ("69 Adams") is a limited liability company incorporated in Delaware and registered with the New York Department of State at the address 505 Flushing Avenue, Brooklyn, New York 11205. Defendant 69 Adams is the owner of Bridgeview DUMBO. As the owner, Defendant 69 Adams was responsible for the overall design and construction of the dwelling units and common areas at Bridgeview. Defendant 69 Adams's managing member is Yitzchok Katz. On information and belief, Defendant 69 Adams is affiliated with the Rabsky Group.

32.    Defendant NY Building Associates Inc. ("NYBA") is a corporation incorporated in Queens County, New York. Defendant NYBA's principal office is located at 124-15 Metropolitan Avenue, Queens, New York. NYBA is the architectural and engineering firm that designed and constructed Astor on Third II and The Northern.

33.    Defendant Naresh Mahangu is a professional engineer licensed in the State of New York. At all times relevant to this action, he was employed by Defendant NYBA. Defendant Mahangu was the architect of record for Astor on Third II and The Northern.

34.    Defendant Hamish Whitefield Architect P.C. ("Whitefield P.C."), doing business as Fischer Rasmussen Whitefield Architects, is a professional service corporation incorporated in Albany County, New York with its principal office located at 21 Belmont Avenue, Pointe-Claire, Quebec, Canada. Upon information and belief, Defendant Whitefield P.C. is the architectural and engineering firm that designed and constructed the multi-family residential dwelling units and common areas at Bridgeview DUMBO.

35.     Defendant Durukan Design, Inc. ("Durukan") is a corporation organized under the laws of the State of New York, incorporated in New York County in the State of New York, and with its principal office located in Brooklyn, New York. Durukan was the interior designer for Astor on Third II and Bridgeview DUMBO's, and it was responsible for designing interiors in the building's residential units and common areas. On information and belief, Durukan was also the interior designer for The Northern and was responsible for designing interiors in the building's residential units and common areas.

**JURISDICTION AND VENUE**

36.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(4), and 2201, and 42 U.S.C. § 3613. This Court has supplemental jurisdiction over the New York State and New York City causes of action pursuant to 28 U.S.C. § 1367(a).

37.     The acts complained of occurred in the Eastern District of New York, and venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because all of the properties at issue in this case are located in this District.

**STATUTORY AND REGULATORY FRAMEWORK**

38.     In 1988, Congress enacted comprehensive amendments to the Fair Housing Act ("FHA") effectuating design and construction accessibility requirements to prohibit discrimination on the basis of disability. The legislative history of the FHA's amendments reflects Congressional findings that steps and thresholds at building or unit entrances send the same signal to persons using a wheelchair as a posted sign saying: "No Disabled People Allowed."

39.     Poorly designed and constructed buildings often exclude people with physical disabilities, including those who use wheelchairs. In considering the 1988 amendments,

Congress stressed that enforcement of civil rights laws is necessary to protect people with disabilities from the "devastating" impact of housing discrimination, including "architectural barriers" erected by architects, developers, and builders who fail to design and construct dwellings and common use areas at those dwellings to be accessible to and adaptable by people with physical disabilities. H.R. Rep. No. 100-711, at 25 (1988), reprinted in 1988 U.S.C.A.A.N. 2173, 2186; 134 Cong. Rec. S10454, 10463 (Aug. 1, 1998).

40.     The FHA mandates that multi-family residential buildings containing four or more units and built for first occupancy after March 13, 1991 ("covered multi-family dwellings") meet certain design and construction requirements. Covered multi-family dwellings must provide, among other things:

   a. Public-use and common-use areas that are readily accessible to, and usable by, people with mobility impairments;

   b. Doors designed to allow passage into all premises within such dwellings that are sufficiently wide to allow passage by people in wheelchairs;

   c. An accessible route into and through the dwellings;

   d. Light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

   e. Reinforcements in bathroom walls that allow for the later installation of grab bars; and

   f. Usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

41.     Pursuant to Congressional authority, the United States Department of Housing and Urban Development ("HUD") promulgated the final FHA design and construction

regulations in January 1989. 24 C.F.R. § 100.205. HUD published the final Fair Housing Accessibility Guidelines on March 6, 1991, 56 Fed. Reg. 9472, which incorporates the requirements of the American National Standards Institute for buildings and facilities providing accessibility and usability for people with physical disabilities, A117-1-1986; HUD also published the Fair Housing Act Design Manual in August 1996, which was revised in August 1998, and the Accessibility Requirements for Covered Multifamily Dwellings under the Fair Housing Act in April 2013.

42.     The New York State Human Rights Law ("NYSHRL") also prohibits the failure to design and construct covered multi-family dwellings in an accessible manner. N.Y. Exec. Law § 296(5), (18).

43.     The New York City Human Rights Law ("NYCHRL") prohibits discriminating in the rental of, or otherwise denying or withholding, a housing accommodation to a renter because of a disability. NYC Admin. Code § 8-107(5); *see id.* § BC 1101 *et seq*. (containing the accessibility requirements under the New York City Building Code).

44.     The New York City Department of Housing Preservation and Development ("HPD") provides assistance to new developments through a variety of programs. Developments that receive HPD assistance are required to set aside a certain number of units as "affordable" and to be rent-stabilized in exchange for being exempt from certain property taxes. Specifically, those developments that receive HPD assistance are required to design and construct five percent of units accessible for people with mobility impairments and two percent of units accessible for

13

people with vision or hearing impairments, and those units must meet heightened accessibility standards set by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.[4]

45.     The Northern participates in one or more HPD-facilitated housing programs requiring the developments to set aside 37 units to be deemed "affordable" and rent-controlled and subjecting the buildings to heightened accessibility requirements.

### FACTUAL ALLEGATIONS

***Astor on Third II***

46.     On February 3, 2022, Astoria 2 LLC purchased the future site for Astor on Third II from GF, LLC.

47.     The same day, Astoria 2 LLC executed mortgage financing documents for the property. Yitzchak Katz executed the documents as the managing member of Astoria 2 LLC.

48.     Astor on Third II's certificate of occupancy was issued by the New York City Department of Buildings ("DOB") on April 9, 2024.

49.     Astor on Third II offers studio, one-bedroom, and two-bedroom apartments. Some of the apartments have private balconies.

50.     All of the apartments at Astor on Third II are covered dwelling units as defined by the FHA and housing accommodations as defined by the New York State and New York City Human Rights Laws.

51.     Astor on Third II has indoor common area amenities that include a lobby, fitness center, media lounge, laundry room, and business center.

52.     Outdoor amenities at Astor on Third II include a roof deck and a parking garage.

---

[4] *See* New York City Department of Housing Preservation and Development, *HPD Design Guidelines for New Construction, v2.02*, at 27, https://www.nyc.gov/assets/hpd/downloads/pdfs/services/hpd-design-guidelines-for-new-construction.pdf.

53.     On May 2, 2024, FHJC sent two FHJC testers to Astor on Third II. Posing as father and daughter, the two testers inquired about available 1- and 2-bedroom apartments on behalf of a relative with disabilities who used a wheelchair.

54.     The two testers were trained and employed by FHJC.

55.     The two testers met with an agent named Aaron who worked with Goose Property Management.

56.     The agent showed the testers the building's common areas and six units: Apartments 411, 501, 602, 607, 614, and 623.

57.     Apartment 411 was described as the "model unit" for the building's 2-bedroom layout.

58.     The testers observed the following during their visit to Astor on Third II:

   a.   The keyhole on the topmost mailbox exceeded the required height limit;

   b.   The door from the building's interior to the roof desk was narrower than the required minimum width for an exterior doorway;

   c.   The threshold from the building's interior to the roof deck was too high without being beveled;

   d.   The doorways of the bathroom and bedroom doors in two apartments—including the model unit—were narrower than the required minimum width for an interior doorway;

   e.   The doorways of the bathroom, bedroom, and vestibule doors in one apartment were narrower than the required minimum width for an interior doorway;

    f.   The thresholds from the interiors of four different apartments to their corresponding private balconies were too high without being beveled;

    g.   The width of the galley kitchen in one apartment was narrower than the required minimum width.

59.    Additional examples of inaccessible features include:

    a.   The dryers in the common laundry room are located above the washer machines, making them too high;

    b.   In the common lounge, there is no accessible booth seating;

    c.   In some apartment units, there is not enough maneuvering space at the bathroom doors;

    d.   In some apartment units, the clear width of the laundry closet door is too narrow;

    e.   In some apartments, the clear width of the walk-in closet door is too narrow;

    f.   In some apartments, the clear width of the balcony doors is too narrow;

    g.   In some apartments, there is not enough maneuvering space at the bedroom doors.

### *The Northern*

60.    On June 2, 2022, 39th Ave 2 purchased the future site of The Northern I from AHRC NYC New Projects, Inc.

61.    On the same day, 39th Ave 1 purchased the future site of The Northern II from AHRC NYC New Projects, Inc.

62.    The original 39th Ave 1 and 39th Ave 2 also jointly executed mortgage financing documents for the properties on June 2, 2022. Yitzchak Katz executed the documents as the managing member of both LLCs.

63.     On July 2, 2024, the original 39th Ave 1 merged into a new corporation with the same name which had the same ownership structure and operated out of the same business structure as the original 39th Ave 1. On information and belief, Yitzchak Katz is the managing member of the existing 39th Ave 1.

64.     On the same day, the original 39th Ave 2 merged into a new corporation with the same name which had the same ownership structure and operated out of the same business structure as the original 39th Ave 2. On information and belief, Yitzchak Katz is the managing member of the existing 39th Ave 2.

65.     The Northern's certificate of occupancy was issued by the DOB on June 26, 2024.

66.     The Northern's website calls both buildings jointly "The Estate," describing them as "two gracefully adjoining buildings[.]"[5]

67.     The Northern offers studio, one-bedroom, two-bedroom, and three-bedroom apartments. Some of the apartments have a balcony or terrace.

68.     All of the apartments at The Northern are covered dwelling units as defined by the FHA and housing accommodations as defined by the New York State and New York City Human Rights Laws.

69.     The indoor amenities at The Northern include a parking garage, co-working space, fitness center, laundry room, package room, bike storage, lounge, and game room.

70.     The outdoor amenities include a shared rooftop and a courtyard.

71.     On June 18, 2024, FHJC sent two FHJC testers to The Northern posing as an aunt and nephew inquiring about an available 1- or 2- bedroom unit on behalf of a relative with disabilities who uses a wheelchair.

---

[5] *See The Estate, supra* note 2.

72.     The testers met with an agent from ERNY LLC.

73.     During their visit, the testers toured Apartments 804, 901, 903, 904, and 905 and were shown the common areas.

74.     On July 22, 2024, FHJC sent two FHJC testers to The Northern posing as cousins inquiring about an available 1- or 2-bedroom unit on behalf of a relative with disabilities who uses a wheelchair.

75.     The two testers met with an agent named Aaron who worked with Goose Property Management.

76.     During their visit, the testers toured Apartments 609 and 613.

77.     On July 30, 2024, FHJC sent one FHJC tester who uses a mobility scooter to The Northern posing as an individual inquiring about an available 1- or 2-bedroom unit.

78.     The tester met with an agent named Jon from Nooklyn NYC LLC.

79.     During her visit, the tester toured Apartments 506, 705, and 802 in The Northern I and Apartments 809, 907, and 1005 in The Northern II.

80.     During the tour of the apartments, the tester discussed the half-step up to the balcony. The agent, Jon, acknowledged the problem by replying, "There must be something we can do about this. Add a ramp or something. Cause you have the ADA on your side."

81.     At various points of the tour, Jon also pointed out how some apartments he was showing her were more narrow than others, which would make it harder for her to "turn around" and "maneuver."

82.     On August 26, 2024, FHJC sent one FHJC tester to The Northern posing as an individual inquiring about an available 1- or 2-bedroom unit.

83.     The tester met with a different agent from Nooklyn NYC LLC.

84.    During her visit, the tester toured Apartment 802 in The Northern I and Apartments 202, 208, 901, and 907 in The Northern II.

85.    On September 11, 2024, FHJC sent one FHJC tester to The Northern posing as an individual inquiring about an available 1- or 2-bedroom unit.

86.    The tester met with an agent from The KCI Group.

87.    During his visit, the tester toured Apartments 202, 315, 310, 806, 807, 809, 909, 1005, and 1006 in The Northern II.

88.    Over the course of all five visits, the testers observed the following during their visits:

a.  The keyhole on the topmost mailbox exceeded the required height limit;

b.  The doors to the phone booths in the co-working space were narrower than the required minimum width for an interior doorway;

c.  The threshold from the building's interior to the communal patio was too high without being beveled;

d.  The threshold from the building's interior to the communal rooftop was too high without being beveled;

e.  The hallway in one apartment contracted to a point that was narrower than the required minimum width for a hallway;

f.  The bathroom door in one apartment opened to the right restricting access to the shower;

g.  The thresholds leading into the bathrooms in five apartments were too high without being beveled;

19

h.  The thresholds from the interiors of eight apartments to their corresponding private balconies or terraces were too high, including as shown in Figure 1, which depicts a half-step up to the terrace.



*Figure 1*

90.  Additional examples of inaccessible features include:

a.  There is no accessible route to the lounge seating on the roof deck;

b.  In some apartments, there is not enough maneuvering space at the bathroom doors;

c.  In some apartment units, the clear width of the laundry closet door is too narrow;

d.  In some apartments, there is insufficient clear floor space beyond the swing of bathroom doors.

*Bridgeview DUMBO*

91.    On November 29, 2016, 69 Adams LLC purchased the future site of Bridgeview DUMBO from Watchtower Bible and Tract Society of New York, Inc.

92.    The same day, 69 Adams executed mortgage financing documents for the property. Simon Dushinsky, one of the managing members of the Rabsky Group, executed the documents as the authorized signatory of 69 Adams LLC.

93.    Bridgeview's certificate of occupancy was issued by the DOB on August 1, 2024.

94.    Bridgeview offers studio, one-bedroom, and two-bedroom apartments. Some of the apartments have private balconies.

95.    All of the apartments at Bridgeview are covered dwelling units as defined by the FHA and housing accommodations as defined by the New York State and New York City Human Rights Laws.

96.    Bridgeview has indoor common area amenities that include a business center, party room, screening room, kid's room, pet spa, laundry room, fitness center, and lounge.

97.    The building's outdoor amenities include a parking garage and a roof deck.

98.    On August 29, 2024, FHJC sent two FHJC testers to Bridgeview posing as two sisters inquiring about an available 1- or 2- bedroom unit on behalf of a relative with disabilities who uses a wheelchair.

99.    The two testers were trained and employed by FHJC.

100.    The two testers met with an agent from EXR.

101.    The agent showed the testers the building's common areas and Apartments 18H, 18G, 25C, 25E, and 26G.

102.    The testers observed the following during their visit to Bridgeview:

    a.    The threshold at the entrance to the building was too high;

21

b.  Both thresholds from the building's interior to the common roof deck were too high without being beveled;

c.  The doors to the private meeting rooms in the business center were narrower than the required minimum width for an interior doorway;

d.  The thresholds leading into the bathrooms in two apartments were too high without being beveled;

e.  The thresholds from the interiors of two apartments to their corresponding private balconies were too high without being beveled;

f.  In one apartment, there was a kitchen with an island that was too close to the opposing counter.

103.  Additional examples of inaccessible features include:

a.  In some apartments, there is not enough maneuvering space at the bathroom doors;

b.  In some apartments, the clear width of the laundry closet door is too narrow;

c.  In some apartments, the door's clear width of the walk-in closets is too narrow.

***Naresh Mahangu Repeatedly Violates Accessibility Requirements Despite Recent Disciplinary Actions***

104.  Defendant Mahangu is the architect of record for Astor on Third II and The Northern, which FHJC testers found to contain multiple accessibility violations.

105.  The DOB issues enforcement bulletins highlighting the agency's actions to "sanction and deter bad actors in the construction industry."

106.  On June 28, 2019, the DOB stated that it had audited "professionally certified applications submitted by Professional Engineer Naresh Mahangu" and found "multiple code

non-compliances," including Mahangu's "failure to comply with accessibility requirements for people with disabilities."

107.    As a result, Defendant Mahangu "agreed to a voluntary surrender of his Professional Certification" and other DOB privileges.

108.    Defendant Mahangu was named as a defendant in another case filed by FHJC, in which FHJC alleged that Mahangu designed Astor on Third, which is down the street from Astor on Third II in a manner that failed to adhere to federal, State, and City accessibility requirements—in other words, the exact failures he is alleged to have committed at Astor on Third II and The Northern. Am. Compl., ECF. No. 32, *Fair Hous. Justice Ctr. v. NY Building Assocs. Inc. et al.,* 23 Civ. 1396 (E.D.N.Y. Dec. 15, 2023).

109.    Based on Defendants' failure to construct multiple buildings in compliance with fair housing laws, it is likely that FHJC will be injured in the future by Defendants' continued construction of additional multi-family residential buildings in New York City that are about to occur as defined by 42 U.S.C. § 3602(i).

**FIRST CAUSE OF ACTION**
Fair Housing Act – 42 U.S.C. § 3604(f)(3)(C)
(Against Defendants Developing NY State LLC, Astoria 2 LLC,
NY Building Associates LLC, Naresh Mahangu, and Durukan Design Inc.)

110.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

111.    Astor on Third II is a "covered multi-family dwelling" as defined by 42 U.S.C. § 3604(f)(7).

112.    Defendants have designed and constructed covered multi-family dwellings and common use areas at Astor on Third II.

113.    As a direct and proximate result of Defendants' failure to design and construct Astor on Third II in compliance with the accessibility requirements of the Fair Housing Act, inaccessible dwellings have been constructed in New York City that reduce housing opportunities for persons with physical disabilities.

114.    As a direct and proximate result of Defendants' failure to design and construct Astor on Third II in compliance with the accessibility requirements of the Fair Housing Act, Plaintiff FHJC has suffered, and will continue to suffer injuries, including damages.

115.    These Defendants' failure to design and construct Astor on Third II in compliance with the accessibility requirements of the FHA was intentional, willful, or done with reckless disregard.

**SECOND CAUSE OF ACTION**
New York State Human Rights Law – N.Y. Exec. Law § 296(5), (18)
(Against Defendants Developing NY State LLC, Astoria 2 LLC,
NY Building Associates LLC, Naresh Mahangu, and Durukan Design Inc.)

116.    Plaintiff realleges and incorporates by references the allegations set forth in this Complaint as if fully set forth herein.

117.    Plaintiff is a person as defined by New York Executive Law § 292(1).

118.    Astor on Third II is a "housing accommodation" as defined by New York Executive Law § 292(10).

119.    Defendants designed and constructed Astor on Third II in violation of the accessibility requirements found in New York Executive Law § 296(18)(3) and the New York State Uniform Fire Prevention and Building Code.

120.    Defendants' design and construction of inaccessible housing constitutes unlawful discrimination against people with disabilities, under New York Executive Law § 296(5).

24

121. As a direct and proximate result of Defendants' failure to design and construct Astor on Third II in compliance with the accessibility requirements of the NYSHRL, Plaintiff has suffered injuries, including damages.

122. Defendants' failure to design and construct Astor on Third II in compliance with the accessibility requirements of the NYSHRL was intentional, willful, or with reckless disregard.

**THIRD CAUSE OF ACTION**
New York City Human Rights Law – N.Y.C. Admin. Code § 8-107(5)
(Against Defendants Developing NY State LLC, Astoria 2 LLC,
NY Building Associates LLC, Naresh Mahangu, and Durukan Design Inc.)

123. Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

124. Plaintiff is "person" and a "person aggrieved" by Defendants' unlawful practices as defined by New York City Administrative Code § 8-102.

125. Astor on Third II is a "housing accommodation" as defined by New York City Administrative Code § 8-102(10).

126. Defendants designed and constructed Astor on Third II in violation of the accessibility requirements found in New York City Administrative Code § 27-292.

127. By doing so, Defendants are discriminating in the furnishing of facilities or services in connection with housing accommodations based on disability in violation of New York City Administrative Code § 8-107(5)(a)(1)(a)-(b).

128. As a direct and proximate result of Defendants' failure to design and construct Astor on Third II in compliance with the accessibility requirements of the NYCHRL, Plaintiff has suffered injuries, including damages.

129. Defendants' failure to design and construct Astor on Third II in compliance with the accessibility requirements of the NYCHRL was intentional, willful, or with reckless disregard.

**FOURTH CAUSE OF ACTION**
Fair Housing Act – 42 U.S.C. § 3604(f)(3)(C)
(Against Defendants Developing NY State LLC, 39th Ave Holdings 1 LLC, 39th Ave Holdings 2 LLC, NY Building Associates LLC, Naresh Mahangu, and Durukan Design Inc.)

130. Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

131. The Northern is a "covered multi-family dwelling" as defined by 42 U.S.C. § 3604(f)(7).

132. Defendants have designed and constructed covered multi-family dwellings and common use areas at The Northern.

133. As a direct and proximate result of Defendants' failure to design and construct The Northern in compliance with the accessibility requirements of the Fair Housing Act, inaccessible dwellings have been constructed in New York City that reduce housing opportunities for persons with physical disabilities.

134. As a direct and proximate result of Defendants' failure to design and construct The Northern and in compliance with the accessibility requirements of the Fair Housing Act, Plaintiff FHJC has suffered, and will continue to suffer injuries, including damages.

135. These Defendants' failure to design and construct The Northern in compliance with the accessibility requirements of the FHA was intentional, willful, or done with reckless disregard.

**FIFTH CAUSE OF ACTION**
New York State Human Rights Law – N.Y. Exec. Law § 296(5), (18)
(Against Defendants Developing NY State LLC, 39th Ave Holdings 1 LLC, 39th Ave Holdings
2 LLC, NY Building Associates LLC, Naresh Mahangu, Durukan Design Inc.)

136.    Plaintiff realleges and incorporates by references the allegations set forth in this Complaint as if fully set forth herein.

137.    Plaintiff is a person as defined by New York Executive Law § 292(1).

138.    The Northern is a "housing accommodation" as defined by New York Executive Law § 292(10).

139.    Defendants designed and constructed The Northern in violation of the accessibility requirements found in New York Executive Law § 296(18)(3) and the New York State Uniform Fire Prevention and Building Code.

140.    Defendants' design and construction of inaccessible housing constitutes unlawful discrimination against people with disabilities, under New York Executive Law § 296(5).

141.    As a direct and proximate result of Defendants' failure to design and construct The Northern in compliance with the accessibility requirements of the NYSHRL, Plaintiff has suffered injuries, including damages.

142.    Defendants' failure to design and construct The Northern in compliance with the accessibility requirements of the NYSHRL was intentional, willful, or with reckless disregard.

**SIXTH CAUSE OF ACTION**
New York City Human Rights Law – N.Y.C. Admin. Code § 8-107(5)
(Against Defendants Developing NY State LLC, 39th Ave Holdings 1 LLC, 39th Ave Holdings
2 LLC, NY Building Associates LLC, Naresh Mahangu, and Durukan Design Inc.)

143.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

144.    Plaintiff is "person" and a "person aggrieved" by Defendants' unlawful practices as defined by New York City Administrative Code § 8-102.

27

145. The Northern is a "housing accommodation" as defined by New York City Administrative Code § 8-102(10).

146. Defendants designed and constructed The Northern in violation of the accessibility requirements found in New York City Administrative Code § 27-292.

147. By doing so, Defendants are discriminating in the furnishing of facilities or services in connection with housing accommodations based on disability in violation of New York City Administrative Code § 8-107(5)(a)(1)(a)-(b)

148. As a direct and proximate result of Defendants' failure to design and construct The Northern in compliance with the accessibility requirements of the NYCHRL, Plaintiff has suffered injuries, including damages.

149. Defendants' failure to design and construct The Northern in compliance with the accessibility requirements of the NYCHRL was intentional, willful, or with reckless disregard.

## SEVENTH CAUSE OF ACTION
Fair Housing Act – 42 U.S.C. § 3604(f)(3)(C)
(Against Defendants Galaxy Developers LLC, 69 Adams LLC,
Hamish Whitefield Architects P.C., and Durukan Design Inc.)

150. Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

151. Bridgeview DUMBO is a "covered multi-family dwelling" as defined by 42 U.S.C. § 3604(f)(7).

152. Defendants have designed and constructed covered multi-family dwellings and common use areas at Bridgeview DUMBO.

153. As a direct and proximate result of Defendants' failure to design and construct Bridgeview DUMBO in compliance with the accessibility requirements of the Fair Housing Act,

28

inaccessible dwellings have been constructed in New York City that reduce housing opportunities for persons with physical disabilities.

154.    As a direct and proximate result of Defendants' failure to design and construct Bridgeview DUMBO in compliance with the accessibility requirements of the Fair Housing Act, Plaintiff FHJC has suffered, and will continue to suffer injuries, including damages.

155.    These Defendants' failure to design and construct Bridgeview DUMBO in compliance with the accessibility requirements of the FHA was intentional, willful, or done with reckless disregard.

**EIGHTH CAUSE OF ACTION**
New York State Human Rights Law – N.Y. Exec. Law § 296(5), (18)
(Against Defendants Galaxy Developers LLC, 69 Adams LLC,
Hamish Whitefield Architects P.C., and Durukan Design Inc.)

156.    Plaintiff realleges and incorporates by references the allegations set forth in this Complaint as if fully set forth herein.

157.    Plaintiff is a person as defined by New York Executive Law § 292(1).

158.    Bridgeview DUMBO is a "housing accommodation" as defined by New York Executive Law § 292(10).

159.    Defendants designed and constructed Bridgeview DUMBO in violation of the accessibility requirements found in New York Executive Law § 296(18)(3) and the New York State Uniform Fire Prevention and Building Code.

160.    Defendants' design and construction of inaccessible housing constitutes unlawful discrimination against people with disabilities, under New York Executive Law § 296(5).

161.    As a direct and proximate result of Defendants' failure to design and construct Bridgeview DUMBO in compliance with the accessibility requirements of the NYSHRL, Plaintiff has suffered injuries, including damages.

29

162.    Defendants' failure to design and construct Bridgeview DUMBO in compliance with the accessibility requirements of the NYSHRL was intentional, willful, or with reckless disregard.

**NINTH CAUSE OF ACTION**
New York City Human Rights Law – N.Y.C. Admin. Code § 8-107(5)
(Against Defendants Galaxy Developers LLC, 69 Adams LLC,
Hamish Whitefield Architects P.C., and Durukan Design Inc.)

163.    Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint as if fully set forth herein.

164.    Plaintiff is "person" and a "person aggrieved" by Defendants' unlawful practices as defined by New York City Administrative Code § 8-102.

165.    Bridgeview DUMBO is a "housing accommodation" as defined by New York City Administrative Code § 8-102(10).

166.    Defendants designed and constructed Bridgeview DUMBO in violation of the accessibility requirements found in New York City Administrative Code § 27-292.

167.    By doing so, Defendants are discriminating in the furnishing of facilities or services in connection with housing accommodations based on disability in violation of New York City Administrative Code § 8-107(5)(a)(1)(a)-(b).

168.    As a direct and proximate result of Defendants' failure to design and construct Bridgeview DUMBO in compliance with the accessibility requirements of the NYCHRL, Plaintiff has suffered injuries, including damages.

169.    Defendants' failure to design and construct Bridgeview DUMBO in compliance with the accessibility requirements of the NYCHRL was intentional, willful, or with reckless disregard.

170.    Plaintiff has caused to be served a copy of this Complaint upon the City Commission on Human Rights and Corporation Counsel, pursuant to New York City Administrative Code § 8-502(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1.  Declaring that Defendants' discriminatory practices violate the FHA, NYSHRL, and NYCHRL;

2.  Enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation with Defendants from discriminating on the basis of disability by failing to design and construct covered multi-family dwellings in compliance with the accessibility requirements of the FHA, NYSHRL, and NYCHRL;

3.  Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation with Defendants to:

    a.  Make or pay for all necessary retrofitting in the multi-family dwellings and common areas of Astor on Third II, The Northern, and Bridgeview DUMBO;

    b.  Make all necessary modifications to the design and construction of multi-family covered dwellings currently planned for construction or under construction in New York City;

    c.  Make all necessary modifications to their policies, practices, and procedures to comply with fair housing laws;

31

d. Train all management, agents, and employees on fair housing laws, including accessibility requirements for multi-family residential dwellings; and

e. Allow monitoring of their design and construction of covered multi-family dwellings and public accommodations for compliance with the accessibility requirements of the FHA, NYSHRL, and NYCHRL;

4. Awarding such damages to Plaintiff as will fully compensate it for injury caused by Defendants' unlawful practices, including the staff time and expenses incurred investigating the unlawful practices described herein, litigating these claims, and monitoring Defendants in the future for continued compliance with the law;

5. Awarding punitive damages to Plaintiff;

6. Directing other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated:        March 25, 2026
              New York, New York

                                          EMERY CELLI BRINCKERHOFF
                                          ABADY WARD & MAAZEL LLP


                                          ___/s/____ _Diane L Houk_____

                                          Diane L. Houk
                                          Nick Bourland
                                          Sydney Zazzaro
                                          One Rockefeller Plaza, 8th Floor
                                          New York, New York 10020
                                          dhouk@ecbawm.com
                                          nbourland@ecbam.com
                                          szazzaro@ecbawm.com
                                          (212) 763-5000

                                          *Attorneys for Plaintiff*

33